# EXHIBIT 3

## STOCK OPTION AGREEMENT

THIS STOCK OPTION AGREEMENT (this "Agreement") is made and entered into as of June 27, 2018 (the "Grant Date"), between Solera Global Holding Corp., a Delaware corporation (the "Company"), and Kurt Lauk ("Optionholder").

The Company and Optionholder desire to enter into this Agreement whereby the Company will grant Optionholder the options specified herein to acquire certain shares of the Company's Common Stock. Defined terms used in this Agreement without definition will have the meanings ascribed thereto in the Company's 2016 Stock Option Plan (the "Plan"), a copy of which is attached hereto as Exhibit A. In the event a provision of this Agreement is inconsistent or conflicts with the provisions of the Plan, the provisions of this Agreement will govern and prevail.

The parties hereto agree as follows:

1.  Plan Acknowledgment. Each of the undersigned agree that this Agreement has been executed and delivered, and the stock options have been granted hereunder, in connection with and as a part of the compensation and incentive arrangements between the Company and Optionholder and, except as otherwise specified herein, pursuant to each of the terms and conditions of the Plan.

2.  Options.

    (a)  Service Option Grant. The Company hereby grants to Optionholder, pursuant to the Plan, an option to purchase up to 1,538 shares of Common Stock (the "Service Option," and such shares, the "Service Option Shares"), at an exercise price per share of $1012.97 (the "Option Price"). The Option Price and the number of Service Option Shares issuable upon exercise of any Service Option shall be subject to the adjustment provisions of Section 8 of the Plan. The Service Option will expire as provided in Section 2(d) below. The Service Option is not intended to be an "incentive stock option" within the meaning of Section 422 of the Code. The "Vesting Commencement Date" for purposes of this Agreement is the Grant Date.

    (b)  Return Target Option Grant. The Company hereby grants to Optionholder, pursuant to the Plan, (i) an option to purchase up to 654 shares of Common Stock (the "Value Option," and such shares, the "Value Option Shares"), and (ii) an option to purchase up to 1,079 shares of Common Stock (the "Stretch Value Option," and together with the Value Option, the "Return Target Option," and such shares, the "Stretch Value Option Shares," and together with the Value Option Shares, the "Return Target Option Shares"), at an exercise price per share equal to the Option Price. The Option Price and the number of Return Target Option Shares issuable upon exercise of any Return Target Option shall be subject to the adjustment provisions of Section 8 of the Plan. The Return Target Option will expire as provided in Section 2(d) below. The Return Target Options are not intended to be "incentive stock options" within the meaning of Section 422 of the Code.

    (c)  Exercisability. Options shall become vested and exercisable in accordance with the provisions of this Section 2(c) and Section 2(f) below. Options which have become vested as of the date of determination are referred to herein as "Vested Options," and all other Options

are referred to herein as "Unvested Options." Optionholder may only exercise Options that are Vested Options.

      (i)   Service Options. The Service Options described in Section 2(a) above will vest and become exercisable with respect to forty percent (40%) of the Service Option Shares on the Vesting Commencement Date with an additional five percent (5%) vesting on the last day of each calendar quarter thereafter solely if Optionholder is, and has been, continuously employed by the Company or its Subsidiaries from the date of this Agreement through such vesting date.

      (ii)   Value Options.

      (A)   Vesting.

      (1) 100% of the Value Options will vest and become exercisable as of any date on or before March 3, 2020 on which the Total Equity Return Multiple is first equal to or greater than two and a quarter (2.25x), subject to Optionholder's continuous employment by the Company or its Subsidiaries from the date of this Agreement through such date.

      (2) Following March 3, 2020, the Value Options will vest and become exercisable in the percentages noted in the table, subject to Optionholder's continuous employment by the Company or its Subsidiaries from the date of this Agreement through any applicable vesting date:

| Total Equity Return Multiple | Aggregate Percentage of Value Options that become Vested |
| --- | --- |
| Less than 2.25x | 0% |
| 2.25x to 3.0x | Between 0% and 100%, calculated on a straight-line basis |
| Greater than 3.0x | 100% |

As used in this Agreement, the term "Total Equity Return Multiple," which shall be determined by the Board acting in good faith, shall mean the quotient of: (I) the cumulative total of all cash distributions made to, or other cash proceeds received by, the Investor Fund (including management or transaction fees and expenses, but excluding any board fees and expenses and any consulting fees billed on an hourly basis by the Vista Consulting Group) in respect of its ownership of equity or debt securities of the Company or any of its Subsidiaries or any loans provided by the Investor Fund during the life of the Investor Fund's investment period, divided by (II) the Investor Fund's total investment in the Company and its Subsidiaries (whether in exchange for equity, indebtedness or otherwise). As used in this Agreement, the term "Investor Fund" shall mean one or more equity buy-out investment funds, excluding any Vista Credit Fund, managed or controlled by Vista Equity Management, LLC or any successor management company. For purposes of calculating the Total Equity Return Multiple, all distributions made to the Investor Funds will be net of all accrued but unpaid consulting fees billed on an hourly basis by the Vista Consulting Group and all expenses associated with the ultimate sale of the Company business. For the purpose of calculating the Total Equity Return Multiple, the Fair Market Value of any residual investment in the Company by the Investor Fund will be treated as having been received by the Investor Funds in cash on the first to occur of a Change of Control and the date the Investor Funds have disposed

of at least 75% of their total investment in the Company (such date, the "Wind Up Date"), with such Fair Market Value being determined as of the Wind Up Date. For the avoidance of doubt, the calculation of the Total Equity Return Multiple shall be determined on the Wind Up Date by taking into account, prior to the calculation of the Total Equity Return Multiple, the vesting (and exercise, if applicable) of all vested Options (including unvested Return Target Options to the extent that they vest pursuant to this Section 2(c)), vested warrants and other outstanding vested rights to acquire, or that are valued by reference to, the capital stock of the Company (including warrants and rights to the extent that they vest in connection with the occurrence of a Wind Up Date). For the purpose of calculating the Total Equity Return Multiple of any residual investment in the Company as of the Wind Up Date, (i) in the case of a Change of Control, the Fair Market Value shall be based on the transaction price and (i) in all other cases, the Fair Market Value shall be based on the weighted average sale price of the capital stock of the Company sold by the Investor Fund prior to and through Wind Up Date.

(B)     No Vesting. For the avoidance of doubt, any Value Options that do not vest or become exercisable upon the Wind Up Date shall expire as of such Wind Up Date.

(iii)     Stretch Value Options.

(A)     Vesting. The Stretch Options will vest and become exercisable in the percentages noted in the table, subject to Optionholder's continuous employment by the Company or its Subsidiaries from the date of this Agreement through any applicable vesting date:

| Total Equity Return Multiple | Aggregate Percentage of Stretch Value Options that become Vested |
|---|---|
| Less than 3.0x | 0% |
| 3.0x to 4.0x | Between 0% and 100%, calculated on a straight-line basis |
| Greater than 4.0x | 100% |

(B)     No Vesting. For the avoidance of doubt, any Stretch Value Options that do not vest or become exercisable upon the Wind Up Date shall expire as of such Wind Up Date.

(iv)     Certain Terminations of Employment.

(A)     Service Options. Notwithstanding anything herein to the contrary, in the event that Optionholder's employment with the Company or its Subsidiaries terminates due to Optionholder's termination without Cause, Optionholder's resignation for Good Reason or Optionholder's death or Disability (each such termination, a "Qualifying Termination"), the Service Options that would have vested during the twelve months immediately following the Termination Date had the Optionholder remained employed by the Company or its Subsidiaries during such period shall vest as of such Termination Date. For purposes of this Agreement, "Disability" means the Optionholder's inability to perform the essential functions of the Optionholder's job, with or without accommodation, as a result of any mental or physical disability

3

or incapacity for an extended period but not less than sixty (60) business days in any consecutive 6 month period, as determined in the sole discretion of the Company.

(B)   Return Target Options.  Notwithstanding anything herein to the contrary, in the event of a Qualifying Termination, the Fair Market Value of the Company as of the date of the Qualifying Termination shall be determined in accordance with the terms of this Agreement (such Fair Market Value, the "Benchmark Value").  Such Benchmark Value shall be used to determine an assumed Total Equity Return Multiple (the "Assumed Return") to calculate the number of Value Options and Stretch Value Options (as applicable) that would vest assuming a Change of Control (with 100% exit of the Investor Fund) occurred at the Benchmark Value on the date of the Qualifying Termination (determined pursuant to 2(c)(ii)(A) or 2(c)(iii)(A) as applicable), assuming, for purposes of the calculation the vesting (and exercise, if applicable) (prior to the calculation of the Total Equity Return Multiple) of outstanding options (to the extent such options would vest pursuant to their terms based on the Assumed Return), warrants and other outstanding rights to acquire capital stock of the Company.  Such resulting number of Value Options and Stretch Value Options will be further multiplied by a fraction, the numerator of which is the number of complete three month anniversaries of the Grant Date through the Termination Date, and the denominator of which is 20 (such final resulting amount, the "Contingent Options"). Any Return Target Options that do not become Contingent Options in accordance with this Section 2(c)(iv)(B) (including by virtue of the Assumed Return implied by the Benchmark Value not meeting the applicable minimum vesting threshold) shall be forfeited as of the date of the Qualifying Termination.  Contingent Options will vest and become exercisable based on the applicable Total Equity Return Multiple actually achieved on or before the Wind Up Date.  On or before the Wind Up Date, if the applicable Total Equity Return Multiple is (i) equal to or greater than the Assumed Return, 100% of the Contingent Options will vest and become exercisable or (ii) less than the Assumed Return, the number of Contingent Options will be reduced to the amount of Return Target Options that that would have become Contingent Options if the Total Equity Return Multiple actually achieved was the Assumed Return as of the Termination Date.  All Contingent Options will be forfeited and immediately cancelled if Optionholder materially violates any restrictive covenant agreement between the Company, or its Subsidiaries, and the Optionholder including non-competition, non-solicitation, confidentiality, assignment of inventions, and defamation covenants. In no event shall a Contingent Option be exercisable following the close of business on the fifteenth anniversary of the date of this Agreement.

(C)   Terminations For Cause.  Notwithstanding anything herein to the contrary, in the event Optionholder's employment with the Company or its Subsidiaries is terminated for Cause, all outstanding Options granted under this Agreement, whether vested or unvested, at the Termination Date, shall be forfeited and immediately cancelled as of the Termination Date.

(d)   Expiration of Options.  Notwithstanding any provision herein to the contrary (with the exception of any Options that vest pursuant to Section 2(c)(iv)(A) or become Contingent Options pursuant to Section 2(c)(iv)(B)), any portion of the Options granted hereunder that have not vested and become exercisable prior to the Termination Date will expire on the Termination Date and may not be exercised under any circumstance. Any portion of the Options granted hereunder that have vested and become exercisable prior to the Termination Date or that vest on the Termination Date pursuant to Section 2(c)(iv)(A) will expire on the earliest of (i) six

4

months after the Termination Date in the event of a termination by the Company without Cause or by the Optionholder for Good Reason or due to the Optionholder's death or Disability, (ii) 90 days after the Termination Date in the event of a termination for any other reason and (iii) the close of business on the tenth anniversary of the date of this Agreement.  Notwithstanding any provision in this Agreement to the contrary, any portion of the Options granted hereunder which have not been exercised prior to or in connection with a Change of Control shall expire upon the consummation of any such transaction.

(e)   Procedure for Exercise.  Optionholder may exercise all or any portion of the Options granted hereunder with respect to Option Shares vested and exercisable pursuant to Section 2(c) above by delivering written notice of exercise to the Company, together with (i) a written acknowledgment that Optionholder has read and has been afforded an opportunity to ask questions of management of the Company regarding all financial and other information provided to Optionholder regarding the Company and its Subsidiaries, (ii) payment in full by delivery of a cashier's, personal or certified check or wire transfer of immediately available funds to the Company in the amount equal to the number of Option Shares to be acquired multiplied by the applicable option exercise price (the "Aggregate Exercise Price"), provided that, Optionholder may, in lieu of paying the Aggregate Exercise Price in cash, indicate in Optionholder's exercise notice that such Optionholder intends to effect a cashless exercise thereof and, in such case, the Company shall cancel such number of Option Shares otherwise issuable to the Optionholder having a Fair Market Value equal to the Aggregate Exercise Price of the Options being exercised, in which event the Company shall only issue Option Shares for the remainder of the Options being exercised after satisfying the Aggregate Exercise Price, (iii) an executed joinder agreement to that certain Stockholders Agreement, dated as of March 3, 2016, by and among the Company and its stockholders signatory thereto (as amended from time to time, the "Stockholders Agreement"), in form and substance reasonably satisfactory to the Company, pursuant to which such Optionholder shall become a party to the Stockholders Agreement and be entitled to the rights and benefits and subject to the duties and obligations of a "Management Stockholder" thereunder, and (iv) an executed consent from Optionholder's spouse (if any) in the form of Exhibit 1 attached to the Plan. As a condition to any exercise of the Options, Optionholder will permit the Company to deliver to him or her all financial and other information regarding the Company and its Subsidiaries which it believes is necessary to enable Optionholder to make an informed investment decision.  If, at any time subsequent to the date Optionholder exercises any portion of the Options granted hereunder and prior to the occurrence of a Change of Control, Optionholder becomes legally married (whether in the first instance or to a different spouse), Optionholder shall cause Optionholder's spouse to execute and deliver to the Company a consent in the form of Exhibit 1 attached to the Plan. Optionholder's failure to deliver to the Company an executed consent in the form of Exhibit 1 to the Plan at any time when Optionholder would otherwise be required to deliver such consent shall constitute Optionholder's continuing representation and warranty that Optionholder is not legally married as of such date.

(i)   For purposes of this Agreement, "Fair Market Value" means the fair market value thereof as determined in good faith by the Board without taking into account any discounts for lack of liquidity or minority interest or other similar discounts; provided, however, that, in the event that the shares of Common Stock are not readily traded or reported on an established national or regional securities exchange (or such shares of Common Stock are determined to be too thinly traded), and the Optionholder believes that

the value determined by the Board to be the Fair Market Value pursuant to the Plan is less than the amount that the Optionholder believes to be the Fair Market Value, (A) the Optionholder may elect to direct the Board to obtain an appraisal of the Fair Market Value (where such election must be in writing and given to the Board within fifteen (15) days after the Optionholder receives the Board's determination of Fair Market Value), which appraisal shall be prepared by a qualified independent appraiser mutually selected by the Board and the Optionholder; (B) if the Board and the Optionholder are unable to agree on such appraiser, they shall each select a qualified independent appraiser, and the two such appraisers shall select a third qualified independent appraiser who has not provided any services to either of the Board or the Optionholder within twenty-four (24) months preceding the engagement for such appraisal, which third appraiser shall prepare the determination of Fair Market Value; and (C) the determination of the independent appraiser shall be a final and binding determination of Fair Market Value; (D) the reasonable cost and expense of such appraisal shall be paid by the Company unless the appraiser's determination is less than 110% of that of the Board, in which case such reasonable cost and expense shall be paid by Optionholder.

(f)   Change of Control.  Upon the consummation of a Change of Control, any Service Options which were Unvested Options immediately prior to such Change of Control shall be deemed Vested Options (such Options which are subject to accelerated vesting being referred to as the "Accelerated Options").  The Optionholder hereby agrees that upon a Change of Control, the Accelerated Options shall be deemed to be automatically exercised through a cashless exercise and Optionholder shall have no further rights under the Accelerated Options other than payment of the consideration, if any, (less any applicable taxes and withholdings) to be paid to the Optionholder (whether in the form of cash or stock) in respect of such deemed exercise of the Accelerated Options as of the Change of Control.

(g)   Securities Laws Restrictions.   Optionholder represents that when Optionholder exercises any portion of the Options he or she will be purchasing the Option Shares represented thereby for Optionholder's own account and not on behalf of others.  Optionholder understands and acknowledges that federal, state and foreign securities laws govern and restrict Optionholder's right to offer, sell or otherwise dispose of any Option Shares unless Optionholder's offer, sale or other disposition thereof is registered under the Securities Act and federal, state and foreign securities laws or, in the opinion of the Company's counsel, such offer, sale or other disposition is exempt from registration thereunder.  Optionholder agrees that he or she will not offer, sell or otherwise dispose of any Option Shares in any manner which would: (i) require the Company to file any registration statement (or similar filing under applicable securities law) with the Securities and Exchange Commission or to amend or supplement any such filing or (ii) violate or cause the Company to violate the Securities Act, the rules and regulations promulgated thereunder or any other applicable securities law.  Optionholder further understands that the certificates for any Option Shares which Optionholder purchases will bear the legend set forth in the Plan or such other legends as the Company deems necessary or desirable in connection with the Securities Act or other rules, regulations or laws.

(h)   Code Section 409A Compliance.  The Company may reduce or expand the period of time following an event in which the vested portion of the Options may be exercised if Internal Revenue Service guidance specifies that such a reduction is required or that such an

6

expansion is permitted under the provisions of Section 409A(a)(2) of the Code. In addition, the Company may (but shall be under no obligation to) make any other changes to this Agreement it determines are necessary to comply with the provisions of Section 409A(a)(2) of the Code. Optionholder hereby agrees and acknowledges that neither the Company nor any of its affiliates makes any representations with respect to the application of Section 409A of the Code to the Options and, by the acceptance of the Options, Optionholder agrees to accept the potential application of Section 409A of the Code to the Option and the other tax consequences of the issuance, vesting, ownership, modification, adjustment, exercise and disposition of the Option.

(i)     <u>Withholding of Taxes</u>.  The Company shall be entitled, if necessary, to withhold from Optionholder from any amounts due and payable by the Company to Optionholder (or secure payment from Optionholder in lieu of withholding) the amount of any withholding or other tax due from the Company with respect to any Options or Common Stock issuable under this Agreement. Following a termination of the Optionholder's employment by the Company without Cause or by the Optionholder for Good Reason or due to the Optionholder's death or disability, Optionholder may satisfy all taxes required to be withheld in connection with the exercise of any Options by directing the Company to withhold shares of Common Stock having a Fair Market Value equal to the aggregate amount of such taxes.

(j)     <u>Limited Transferability of the Options</u>.  The Options granted hereunder are personal to Optionholder and are not transferable by Optionholder except pursuant to the laws of descent or distribution.  Only Optionholder or his legal guardian or representative may exercise the Options granted hereunder.  For the avoidance of doubt, any Service Option Shares or Return Target Option Shares exercised by Optionholder hereunder shall be subject to the transfer restrictions set forth in the Plan and the Stockholders Agreement; <u>provided</u>, <u>that</u> following a Change of Control or an IPO, Option Shares may only be transferred in the same proportion as the Investors have transferred their equity interests relative to the number of equity interests owned by the Investors prior to such Change of Control or IPO.

(k)     <u>Repurchase Option</u>.  Notwithstanding anything to the contrary in Section 12 of the Plan, (i) the Repurchase Option shall only be applicable if (A) Optionholder's employment with the Company or its Subsidiaries is terminated for Cause or (B) Optionholder materially violates Section 6 of Optionholder's Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement, if applicable, or any other restrictive covenant agreement between the Company or its Subsidiaries, and (ii) the Initial Repurchase Notice must be delivered no later than (A) in the case of a termination for Cause, 180 days after the Termination Date and (B) in the event of a willful and material violation of Section 6 of Optionholder's Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement, if applicable, or any other restrictive covenant agreement between the Company or its Subsidiaries, the earlier of thirty (30) days following the date the Company becomes aware of such a material violation and twenty one (21) months after the Termination Date. The price per share upon exercise of the Repurchase Option shall be Original Cost.

(l)     <u>Dividends and Other Distributions</u>.   If the Company makes an Extraordinary Distribution then: (i) the Company shall pay the Optionholder, at the time of such Extraordinary Distribution, an amount of cash equal to the Extraordinary Distribution on each share of Common Stock subject to a vested Option to the extent the Fair Market Value of the share

7

of Common Stock subject to the vested Option immediately before the Extraordinary Distribution exceeds the per share exercise price of such vested Option, (ii) to the extent the Company is not required to pay the Optionholder the full amount of the Extraordinary Distribution on shares of Common Stock subject to the vested Options pursuant to clause (i), the Company shall reduce the exercise price for each vested Option by A minus B, where A equals the excess of the Fair Market Value of a share of Common Stock immediately prior to the Extraordinary Distribution over the Fair Market Value of a share of Common Stock immediately after the Extraordinary Distribution and B equals the amount of the Extraordinary Distribution paid to the Optionholder pursuant to clause (i) with respect to each share of Common Stock subject to the vested Option and (iii) the Company shall reduce the exercise price of all unvested Options by the amount of the excess of the Fair Market Value of a share of Common Stock immediately prior to the Extraordinary Distribution over the Fair Market Value of a share of Common Stock immediately after the Extraordinary Distribution; provided that (A) if after any adjustment contemplated by clauses (ii) or (iii) above, the exercise price of an Option would be less than 25% of the Fair Market Value of a share of Common Stock, the Company shall adjust the Option in the manner contemplated by Treasury Regulation § 1.424-1(e) such that the aggregate Option spread before and after the adjustment remains unchanged and the ratio price of exercise price to Fair Market Value of a share of Common Stock is 25% and (B) all adjustments contemplated in this Section 2(l) shall be implemented in accordance with, and to the extent permitted by, Treasury Regulation § 1.409A-1(b)(5)(v)(D). For purposes of this Agreement, "Extraordinary Distribution" means a cash dividend that would qualify as a "corporate transaction" under Treasury Regulation §1.424-1.

3.    Optionholder's Representations.  Optionholder hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Optionholder does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Optionholder is a party or by which he or she is bound, (ii) Optionholder is not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity (other than the Company or one of its Subsidiaries) and (iii) upon the execution and delivery of this Agreement by the Company and Optionholder, this Agreement shall be the valid and binding obligation of Optionholder, enforceable against Optionholder in accordance with its terms. Optionholder hereby acknowledges and represents that he or she has consulted with (or has had an opportunity to consult with) independent legal counsel regarding his or her rights and obligations under this Agreement (including, without limitation, the Plan) and that he or she fully understands the terms and conditions contained herein and therein.

4.    Notices.  Any notices required or permitted under this Agreement or the Plan will be delivered in accordance with the requirements of the Plan.

5.    Third Party Beneficiaries; Successors and Assigns.   The parties hereto acknowledge and agree that the Investor Funds are third party beneficiaries of this Agreement and the Plan. Except as otherwise provided herein, this Agreement and the Plan shall bind and inure to the benefit of and be enforceable by Optionholder, the Company and the Investor Funds and their respective heirs, successors and assigns (including subsequent holders of Option Shares); provided that the rights and obligations of Optionholder under this Agreement and the Plan shall not be assignable except in connection with a permitted transfer of Option Shares in accordance with the Plan.

8

6.      Section 83(b) Election.  Within 30 days after Optionholder has exercised any portion of the Option, in the event Optionholder is subject to United States federal income tax, Optionholder may make an effective election with the Internal Revenue Service under Section 83(b) of the Code (an "83(b) Election") relative to the Option Shares received by Optionholder pursuant to the exercise of such portion of the Option.  Employee further acknowledges and understands that it is Employee's sole obligation and responsibility to timely file such 83(b) Election, and neither the Company nor the Company's legal or financial advisors shall have (i) any obligation or responsibility with respect to such filing or (ii) any liability resulting or arising from the failure to timely file such 83(b) Election.

7.      Complete Agreement.  This Agreement and the Plan and the other documents referred to herein and therein embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

8.      No Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

9.      Counterparts.  This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

10.     Governing Law.  This Agreement will be subject to the Governing Law provisions of the Plan as if fully set forth in this Agreement.

11.     Remedies.  Each of the parties to this Agreement will be entitled to any of the remedies specified in the Plan.

12.     Amendment and Waiver.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Board and Optionholder, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

*   *   *   *   *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

SOLERA GLOBAL HOLDING CORP.

By: _____

Its: _____


_____
Kurt Lauk

**EXHIBIT 1**

## CONSENT

The undersigned spouse hereby acknowledges that I have read the following agreements to which my spouse is a party:

Summertime Holding Corp. 2016 Stock Option Plan,

Stock Option Agreement

and that I understand their contents.  I am aware that such agreements provide for the repurchase of certain of my spouse's capital stock of Summertime Holding Corp. (the "Company") under certain circumstances and impose other restrictions on such capital stock.  I agree that my spouse's interest in such capital stock is subject to the agreements referred to above and the other agreements referred to therein and any interest I may have in such capital stock shall be irrevocably bound by these agreements and the other agreements referred to therein and further that my community property interest (if any) shall be similarly bound by these agreements.

The undersigned spouse irrevocably constitutes and appoints _____(the "Stockholder") as the undersigned's true and lawful attorney and proxy in the undersigned's name, place and stead to sign, make, execute, acknowledge, deliver, file and record all documents which may be required, and to manage, vote, act and make all decisions with respect to (whether necessary, incidental, convenient or otherwise), any and all capital stock of the Company in which the undersigned now has or hereafter acquires any interest and in any and all capital stock of the Company now or hereafter held of record by the Stockholder (including but not limited to, the right, without further signature, consent or knowledge of the undersigned spouse, to exercise or not to exercise any and all options under any appropriate agreements and to exercise amendments and modifications of and to terminate the foregoing agreements and to dispose of any and all such capital stock and options), with all powers the undersigned spouse would possess if personally present, it being expressly understood and intended by the undersigned that the foregoing power of attorney and proxy is coupled with an interest; and this power of attorney is a durable power of attorney and will not be affected by disability, incapacity or death of the Stockholder, or dissolution of marriage and this proxy will not terminate without  consent of the Stockholder and the Company.

Stockholder:

_Lauk_ (signature)

Signature

KURT LAUK

Printed Name

7. AUG. 2018

Dated

Spouse of Stockholder:

_____
Signature

_____
Printed Name

_____
Dated

SUBSCRIBED AND SWORN to
before me this _____ day
of _____, 20__

My Commission Expires

_____

_____
Notary Public

_____

096478-0014-14713-Active.18380343.10

Exhibit A

2016 Stock Option Plan

## SUMMERTIME HOLDING CORP.

## 2016 STOCK OPTION PLAN

1. <u>Purpose of Plan</u>. This 2016 Stock Option Plan (the "<u>Plan</u>") of Summertime Holding Corp., a Delaware corporation (the "<u>Company</u>"), is designed to provide incentives to such present and future employees, directors, officers, consultants or advisors of the Company or its subsidiaries ("<u>Participants</u>"), as may be selected in the sole discretion of the Committee, through the grant of Options by the Company to Participants. Only those Participants who are employees of the Company or its Subsidiaries shall be eligible to receive incentive stock options within the meaning of Section 422 of the Code. This Plan is a compensatory benefit plan within the meaning of Rule 701 of the Securities Act of 1933, as amended, and, unless and until the Company's Common Stock is publicly traded, the issuance of options to purchase shares of the Company's Common Stock pursuant to the Plan and the issuance of shares of Common Stock pursuant to such options are, to the extent permitted by applicable federal securities laws, intended to qualify for the exemption from registration under Rule 701 of the Securities Act.

2. <u>Definitions</u>. Certain terms used in this Plan have the meanings set forth below:

"<u>Board</u>" means the Company's board of directors.

"<u>Cause</u>" shall have the meaning ascribed to such term in any written offer letter or employment or severance agreement between the Company or any Subsidiary of the Company and such Participant, or in the absence of any such written agreement, shall mean (i) the commission of a felony or any other act or omission involving dishonesty, disloyalty or fraud with respect to the Company or any of its Subsidiaries or any of their customers or suppliers if the act or omission was wrongful or deliberate, or any other crime involving moral turpitude, (ii) conduct tending to bring the Company or any of its Subsidiaries into public disgrace or disrepute or economic harm, (iii) repeated material failure or inability to perform duties and/or obligations as reasonably directed by the Board or its designees, after demand for performance has been given by the Board or its designees that identifies how such Participant has not performed its duties and/or obligations, (iv) gross negligence or misconduct with respect to the Company or any of its Subsidiaries, (v) any material breach of (A) any written agreement between the Company and such Participant evidencing the grant of any Option (B) the Company's written code of conduct and business ethics or (C) any other written agreement between such Participant and the Company or any Subsidiary of the Company.

"<u>Change of Control</u>" means the first to occur of any (i) Sale of the Company, or (ii) sale or transfer to any third party of shares of the Company's capital stock by the holders thereof as a result of which any person or group other than the Investors obtains possession of voting power (under ordinary circumstances) to elect a majority of the Company's board of directors.

"<u>Common Stock</u>" means the Company's Common Stock, par value $0.01 per share.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, as the same may be amended from time to time.

"Investors" means Vista Equity Partners Fund V, L.P., Vista Equity Partners Fund V-A, L.P., Vista Equity Partners Fund V-B, L.P., VEPF V FAF, L.P., Vista Equity Partners Fund V Executive, L.P., Vista Equity Associates V, LLC and VEPF V Co-Invest 2, L.P. and/or any transferee of any of the foregoing Persons and any affiliate of any of the foregoing Persons that holds Common Stock, and "Investor" means any of the Investors individually.

"IPO" means an initial public offering and sale of the Company's Common Stock pursuant to an effective registration statement under the Securities Act.

"Option" means any option enabling the holder thereof to purchase any shares of the Company's Common Stock granted by the Committee pursuant to the provisions of this Plan. Options to be granted under this Plan may be incentive stock options within the meaning of Section 422 of the Code ("Incentive Stock Options") or in such other form, consistent with this Plan, as the Committee may determine.

"Option Shares" means the shares of the Company's Common Stock acquired (or to be acquired) pursuant to the exercise of any Option.

"Original Cost" of each Option Share will be equal to the price paid therefor (in each case, as proportionally adjusted for all stock splits, stock dividends and other recapitalizations affecting such share of Common Stock subsequent to any such purchase).

"Participate" (and the correlative terms "Participating" and "Participation") includes any direct or indirect ownership interest in any enterprise or participation in the management of such enterprise, whether as an officer, director, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, executive, franchisor, franchisee, creditor, owner or otherwise.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint share company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Restricted Period" means, if the Participant is party to a written agreement with the Company that contains a non-competition covenant, the period such covenant applies following the Participant's Termination Date or, if the Participant is not party to such an agreement, the 12 month period following the Participant's Termination Date.

"Sale of the Company" means (i) any sale or transfer by the Company or its Subsidiaries of all or substantially all (as defined under Delaware law) of their assets on a consolidated basis, or (ii) any consolidation, merger or reorganization of the Company with or into any other entity or entities as a result of which any person or group other than the Investors obtains possession of voting power (under ordinary circumstances) to elect a majority of the surviving corporation's board of directors.

"Securities Act" means the Securities Act of 1933, as amended.

3

and no Participant nor any other Person shall have any further rights or obligations with respect to such forfeited Options.

It is the Company's intent that, except as otherwise specifically provided in a written award agreement with respect to an Option, the Options are not treated as a nonqualified deferred compensation plan that fails to meet the requirements of Section 409A(a)(2), (3) or (4) of the Code and that any ambiguities in construction be interpreted in order to effectuate such intent. Options under the Plan shall contain such terms as the Committee determines are appropriate to be exempt from, or comply with, the requirements of Section 409A of the Code. In the event that, after the issuance of an Option under the Plan, Section 409A of the Code or the regulations thereunder are amended, or the Internal Revenue Service or Treasury Department issues additional guidance interpreting Section 409A of the Code, the Committee may modify the terms of any such previously issued Option to the extent the Committee determines that such modification is necessary to comply with the requirements of Section 409A of the Code. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on any Participant by Code Section 409A or damages for failing to comply with Code Section 409A.

5.  <u>Limitation on the Aggregate Number of Shares of Common Stock</u>.  The number of shares of Common Stock with respect to which Options may be granted under this Plan (and which may be issued upon the exercise or payment thereof) shall not exceed, in the aggregate, 401,294 shares of Common Stock (as such number is equitably adjusted pursuant to <u>Section 8</u> hereof).  If any Options expire unexercised or unpaid or are canceled, terminated or forfeited in any manner without the issuance of shares of Common Stock or payment thereunder, the shares with respect to which such Options were granted shall again be available under this Plan.  Similarly, if any shares of Common Stock issued hereunder upon exercise of Options are repurchased hereunder, such shares shall again be available under this Plan for reissuance as Options.

6.  <u>Incentive Stock Options</u>.  Any of the Options to be granted hereunder may constitute Incentive Stock Options to the extent expressly designated as such by the Committee or the Board.  All Incentive Stock Options (i) shall have an exercise price per share of Common Stock of not less than 100% of the Fair Market Value of such share on the date of grant, (ii) shall not be exercisable more than ten years after the date of grant, (iii) shall not be transferable other than by will or under the laws of descent and distribution and, during the lifetime of the Participant to whom such Incentive Stock Options were granted, may be exercised only by such Participant (or his guardian or legal representative) and (iv) shall be exercisable only during the Participant's employment by the Company or a Subsidiary, <u>provided</u>, <u>however</u>, that the Committee may, in its discretion, provide at the time that an Incentive Stock Option is granted that such Incentive Stock Option may be exercised for a period ending no later than either (x) the termination of this Plan in the event of the Participant's death while an employee of the Company or a Subsidiary or (y) the date which is three months after the Termination Date for any other reason. The Committee's discretion to extend the period during which an Incentive Stock Option is exercisable shall only apply if and to the extent that (i) the Participant was entitled to exercise such option on the date of termination and (ii) such option would not have expired had the Participant continued to be employed by the Company or a Subsidiary.  To the extent that the aggregate Fair Market Value of shares with respect to which Incentive Stock Options are exercisable for the first time by any

5

11. <u>Participant Acknowledgments</u>.  In connection with the grant of any Option and/or the issuance of any Common Stock pursuant to this Plan, each Participant acknowledges and agrees, that as a condition to any such grant or issuance:

(a) The Company will have no duty or obligation to disclose to any Participant, and no Participant will have any right to be advised of, any material information regarding the Company or its Subsidiaries at any time prior to, upon or in connection with the repurchase of any Option Shares upon the termination of such Participant's employment with the Company or its Subsidiaries or as otherwise provided under this Plan or any written agreement evidencing the grant of any Option or the issuance of any shares of Common Stock.

(b) Neither the grant of any Option, the issuance of any Common Stock nor any provision contained in this Plan or in any written agreement evidencing the grant of any Option or the issuance of any Common Stock shall entitle such Participant to remain in the employment of the Company or its Subsidiaries or affect the right of the Company to terminate any Participant's employment at any time for any reason.

(c) Such Participant will have consulted, or will have had an opportunity to consult with, independent legal counsel regarding his or her rights and obligations under this Plan and any written agreement evidencing any grant of any Option and he or she fully understands the terms and conditions contained herein and therein.

(d) Prior to the purchase of any shares of Common Stock pursuant to this Plan or any written agreement evidencing the purchase of any shares of Common Stock, such Participant will deliver to the Company an executed consent from such Participant's spouse (if any) in the form of <u>Exhibit 1</u> attached hereto.  If, at any time subsequent to the date such Participant purchases any shares of Common Stock and prior to the occurrence of a Change of Control, such Participant becomes legally married (whether in the first instance or to a different spouse), such Participant shall cause his or her spouse to execute and deliver to the Company a consent in the form of <u>Exhibit 1</u> attached hereto.  Such Participant's failure to deliver the Company an executed consent in the form of <u>Exhibit 1</u> at any time when such Participant would otherwise be required to deliver such consent shall constitute such Participant's continuing representation and warranty that such Participant is not legally married as of such date.  At the request of the Company, all Participants shall execute a joinder to any stockholders agreement among the equityholders of the Company then in effect.

7

Repurchase Notice and Initial Repurchase Notice, a "Repurchase Notice") to each of the parties receiving the Investor Repurchase Notice within 15 business days following the Initial Investor Repurchase Period; provided that if in the aggregate such Investors elect to purchase more than the remaining available Option Shares, such remaining available Option Shares purchased by each Investor will be reduced on a pro rata basis based upon the number of shares of Common Stock then held by each electing Investor. Each Repurchase Notice will set forth the number of Option Shares to be acquired from such holder(s), the aggregate consideration to be paid for such Option Shares and the time and place for the closing of the transaction. If any Option Shares are held by any transferees of a Participant, the Investors and the Company, as the case may be, will purchase the shares elected to be purchased from all such holder(s) of Option Shares, pro rata according to the number of Option Shares held by each such holder(s) at the time of delivery of such Repurchase Notice (determined as nearly as practicable to the nearest share). If Option Shares of different classes are to be purchased pursuant to the Repurchase Option and such Option Shares are held by any transferees of a Participant, the number of shares of each class of Option Shares to be purchased will be allocated among all such holders, pro rata according to the total number of Option Shares to be purchased from such Persons.

(d)     Closing. The closing of the transactions contemplated by this Section 12 will take place on the date designated in the applicable Repurchase Notice, which date will not be more than 90 days after the delivery of such notice. Each Investor will pay for the Option Shares to be purchased by it by, at its option, wire transfer of immediately available funds or delivery of a check payable to the holder of such Option Shares. The Company will pay for the Option Shares to be purchased by it by first offsetting amounts outstanding under any bona fide debts owing by such Participant to the Company or any of its Subsidiaries, now existing or hereinafter arising (irrespective as to whether such amounts are owing by the holder of such Option Shares), and will pay the remainder of the purchase price by, at its option, (i) wire transfer of immediately available funds, (ii) delivery of a check payable to the holder of such Option Shares, (iii) a subordinated promissory note payable in three equal annual installments commencing on the first anniversary of the closing of such purchase and bearing interest at a rate per annum equal to 5% or (iv) a combination of (i), (ii) and (iii), in the aggregate amount of the purchase price for such shares. Notwithstanding anything to the contrary contained herein, all repurchases of Option Shares by the Company will be subject to applicable restrictions contained in the corporation law of the Company's jurisdiction of incorporation and in the Company's and its Subsidiaries' bona fide debt and equity financing agreements. If any such restrictions prohibit the repurchase of Option Shares hereunder which the Company is otherwise entitled to make, the Company shall issue the Participant a note bearing interest at the Applicable Federal Rate in effect for mid-term loans (for which interest is compounded semi-annually), which will be settled when and to the extent it is permitted under such restrictions but in any event within five (5) years of issuance. The Investors and/or the Company, as the case may be, will receive customary representations and warranties from each seller regarding the sale of the Option Shares, including, but not limited to, representations that such seller has good and marketable title to the Option Shares to be transferred free and clear of all liens, claims and other encumbrances.

13.     Transfer of Option Shares; Sale of the Company; Public Offering. Option Shares are subject to restrictions on transfer, as set forth in the Stockholders Agreement. In addition, Option Shares are subject to certain bring-along rights and obligations in connection with a Sale

9

and the Company shall not record such transfer on its books or treat any purported transferee of such Option Shares as the owner of such shares for any purpose.

17. <u>Severability</u>.   Whenever possible, each provision of this Plan will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Plan is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Plan will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

18. <u>Remedies</u>.  Each of the Company, any Participant and the Investors will be entitled to enforce its rights under this Plan specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Plan and to exercise all other rights existing in its favor.  Each Participant and the Company acknowledges and agrees that money damages may not be an adequate remedy for any breach of the provisions of this Plan and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Plan.

19. <u>Business Days</u>.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or holiday in the state in which the Company's chief executive office is located, the time period shall be automatically extended to the business day immediately following such Saturday, Sunday or holiday.

20. <u>Governing Law</u>.  All issues concerning this Plan will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision of rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Delaware.  Each of the Company and each Participant submits to the co-exclusive jurisdiction of the United States District Court and any Delaware state court sitting in Wilmington, Delaware over any lawsuit under this Plan and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein.  Each of the Company and each Participant waives the necessity for personal service of any and all process upon it and consents that all such service of process may be made by registered or certified mail (return receipt requested), in each case directed to such party in accordance with the notice requirements set forth in this Plan, and service so made will be deemed to be completed on the date of actual receipt.  Each of the Company and each Participant consents to service of process as aforesaid.  Nothing in this Plan will prohibit personal service in lieu of the service by mail contemplated herein.

21. <u>Notices</u>.  Any notice required or permitted under this Plan or any agreement executed and delivered in connection with this Plan shall be in writing and shall be either delivered by facsimile (which shall be effective upon receipt of confirmation of successful transmission), personally delivered, or mailed by first class mail, return receipt requested, to any Participant at the address indicated in the Company's records for such Person, and to the Company at the facsimile number and address below indicated:

Notices to the Company:

11

096478-0014-14713-Active.18380343.10

**Illustrative Examples of Solera Global Holding Corp. Stock Options Value Upon a Change of Control Sale of the Company ("Sale")**
(All proceeds amounts are pre-withholding and pre-tax to the Optionholder)

**Assumptions:**

| | |
|---|---|
| Aggregate number of Option Shares: | 100 |
| Exercise price per Option Share: | $1,012.97 |
| Number of Time-Based Option Shares ("Service Options"): | 47 (47% of 100 Option Shares) |
| Number of Performance-Based Value Option Shares ("Value Options"): | 20 (20% of 100 Option Shares) |
| Number of Performance-Based Stretch Option Shares ("Stretch Options"): | 33 (33% of 100 Option Shares) |
| Vista Equity Partners ("VEP") initial price per common share ("Share"): | $1,000.00 |

---

### Scenario 1 – Sale Resulting in 2.0x VEP Return

| | |
|---|---|
| Sale proceeds per Share: | $2000.00 |
| VEP Return: | 2.0x ($2,000.00 VEP proceeds per Share /$1,000 VEP initial price per Share) |
| Option Share proceeds to Optionholder ("Options Spread"): | $987.03 ($2,000.00 proceeds per Share - $1,012.97 Option Share exercise price) |

- Service Options Proceeds:
  - All Service Options vesting is accelerated and all become vested 100% upon the Sale — **$46,390.41** ($987.03 Options Spread * 47 Service Options vested)
- Value Options Proceeds:
  - Zero Value Options are vested as VEP Return is below 2.25x minimum return to trigger Value Options vesting — **$0.00** ($987.03 Options Spread * 0 Value Options vested)
- Stretch Options Proceeds:
  - Zero Stretch Options are vested as VEP Return is below 3.01x minimum return to trigger Stretch Options vesting — **$0.00** ($987.03 Options Spread * 0 Stretch Options vested)

| Total Proceeds to Optionholder: | $46,390.41 |
|---|---|

---

### Scenario 2 – Sale Resulting in 3.0x VEP Return

| | |
|---|---|
| Sale proceeds per Share: | $3000.00 |
| VEP Return: | 3.0x ($3,000.00 VEP proceeds per Share /$1,000.00 VEP initial price per Share) |
| Options Spread: | $1,987.03 ($3,000.00 proceeds per Share - $1,012.97 Option Share exercise price) |

- Service Options Proceeds:
  - All Service Options vesting is accelerated and all become vested 100% upon the Sale — **$93,390.41** ($1,987.03 Options Spread * 47 Service Options vested)
- Value Options Proceeds:
  - All Value Options are vested as VEP Return is equal to 3.0x — **$39,740.60** ($1,987.03 Options Spread * 20 Value Options vested)
- Stretch Options Proceeds:
  - Zero Stretch Options are vested as VEP Return is below 3.01x minimum return to trigger Stretch Options vesting — **$0.00** ($1,987.03 Options Spread * 0 Stretch Options vested)

| Total Proceeds to Optionholder: | $133,131.01 |
|---|---|

---

### Scenario 3 – Sale Resulting in 4.0x VEP Return

| | |
|---|---|
| Sale proceeds per Share: | $4000.00 |
| VEP Return: | 4.0x ($4,000.00 VEP proceeds per Share /$1,000.00 VEP initial price per Share) |
| Options Spread: | $2,987.03 ($4,000.00 proceeds per Share - $1,012.97 Option Share exercise price) |

- Service Options Proceeds:
  - All Service Options vesting is accelerated and all become vested 100% upon the Sale — **$140,390.41** ($2,987.03 Options Spread * 47 Service Options vested)
- Value Options Proceeds:
  - All Value Options are vested as VEP Return is greater than 3.0x — **$59,740.60** ($2,987.03 Options Spread * 20 Value Options vested)
- Stretch Options Proceeds:
  - All Stretch Options are vested as VEP Return is equal to 4.0x — **$98,571.99** ($2,987.03 Options Spread * 33 Stretch Options vested)

| Total Proceeds to Optionholder: | $298,703.00 |
|---|---|

Summertime Holding Corp.
c/o Vista Equity Partners III, LLC
Four Embarcadero Center, 20th Floor
San Francisco, CA 94111
Attention:  David A. Breach and Christian Sowul

With a copy to:

Kirkland & Ellis LLP
555 California Street, Suite 2700
San Francisco, California 94104
Attention:  Stuart E. Casillas, P.C.
Facsimile No.: (415) 439-1500
E-mail:  scasillas@kirkland.com

or such other facsimile number or address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Plan shall be deemed to have been given when so delivered or mailed.

*   *   *   *   *

12

096478-0014-14713-Active.18380343.10

of the Company and an IPO. Prior to the exercise of any Option, Participants shall be given the opportunity to review such provisions of the Stockholders Agreement.

14. <u>Additional Restrictions on Transfer</u>.

(a)     The certificates representing the Option Shares will bear the following legend:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN THE ISSUER'S 2016 STOCK OPTION PLAN AND A WRITTEN AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF SUCH SECURITIES, COPIES OF WHICH MAY BE OBTAINED BY THE HOLDER HEREOF AT THE ISSUER'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

(b)     No holder of Option Shares will effect any public sale or distribution (including sales pursuant to Rule 144 of the Securities Act) of any Option Shares or of any other equity securities of the Company, or any securities, options or rights convertible into or exchangeable or exercisable for such securities, during the seven days prior to and the 180-day period beginning on the effective date of any underwritten public offering of the Company's securities in which the Investors or any of their Affiliates participate, except as part of such underwritten public offering. The restrictions on transfer set forth in this <u>Section 14(b)</u> shall continue with respect to each Option Share and each other security, option or right described in the preceding sentence until the date on which such security has been transferred pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 adopted under the Securities Act.

15. <u>Definition of Option Shares</u>.   For all purposes of this Plan, Option Shares will continue to be Option Shares in the hands of any holder other than such Participant (except for the Company, the Investors or purchasers pursuant to an offering registered under the Securities Act or purchasers pursuant to a Rule 144 transaction, and each such other holder of Option Shares will succeed to all rights and obligations attributable to such Participant as a holder of Option Shares hereunder and under any separate written agreement between the Company and such Participant. Option Shares will also include shares of the Company's capital stock issued with respect to Option Shares by way of a share split, share dividend or other recapitalization.

16. <u>Transfers in Violation of Plan</u>.   Any transfer or attempted transfer of any Option Shares in violation of any provision of this Plan or the Stockholders Agreement shall be void,

10

12. <u>Repurchase Option</u>.

(a)    <u>Repurchase Option</u>.  If a Participant is no longer employed (or in the case of a Participant who was not an employee, the date on which such Participant is no longer acting as a director or officer of, or consultant or advisor to, the Company or any of its Subsidiaries) by the Company or its Subsidiaries for any reason, or if a Participant engages in material Competitive Activity, the Option Shares (whether held by such Participant or one or more transferees of such Participant, other than the Company or any Investor) will be subject to repurchase by the Investors and the Company (each of the aforementioned solely at their option) pursuant to the terms and conditions set forth in this <u>Section 12</u> (the "<u>Repurchase Option</u>").

(b)    <u>Repurchase Price</u>.  Unless otherwise set forth in an award agreement between the Company and a Participant, following the Termination Date, the Investors and the Company may elect to repurchase all or any portion of the Option Shares at a price per share equal to (i) Original Cost, in the event of Participant's termination for Cause, or in the event Participant resigns without Good Reason within 5 years after the grant date, or in the event Participant engages in a material Competitive Activity, prior to the repurchase date, or (ii) Fair Market Value (as of the date of repurchase), in the event of the Participant's termination without Cause, due to the Participant's death or disability or in the event Participant resigns for Good Reason, provided that if Participant engages in a material Competitive Activity  following the Termination Date, Participant shall pay to the Company the difference between the Fair Market Value (as of the date of repurchase) and the Original Cost, if any.  In the event any rights pursuant to the Repurchase Option may arise, the Company will promptly notify the Investors thereof.

(c)    <u>Repurchase Procedures</u>.  Subject to <u>Section 12(b)</u>, the Company may elect to exercise the Repurchase Option to purchase all or any portion of the Option Shares by delivering written notice (the "<u>Company Repurchase Notice</u>") to the holder or holders of the Option Shares and the other Investors no later than 180 days after the latest of (i) the Termination Date, (ii) the 181st day following the acquisition of the Option Shares subject to such repurchase and (iii) the date the Company becomes aware of material Competitive Activity (such latest date, the "<u>Company Expiration Date</u>").  If the Board determines in good faith that (x) any applicable restrictions contained in the corporation law of the Company's jurisdiction of incorporation or in the Company's and its Subsidiaries' bona fide debt financing agreements with parties unaffiliated with the Investors prohibit the Company from repurchasing all of the Option Shares, or (y) it is in the best interests of the Company not to purchase all or any portion of Option Shares, no later than the fifth business day following the Repurchase Expiration Date, the Company will notify the Investors in writing that each Investor shall be entitled to purchase up to its pro rata share (determined based upon the number of shares of Common Stock then held by each such Investor) of the remaining Option Shares by providing notice (the "<u>Investor Repurchase Notice</u>") to each holder or holders of Option Shares within 15 business days following the Company Expiration Date (the "<u>Initial Investor Repurchase Period</u>").  To the extent that any of the Investors do not elect to repurchase their full allotment of Option Shares during the Initial Investor Repurchase Period, the Company will promptly notify in writing each of the Investors that certain Investors have not elected to purchase their full allotment of Option Shares, and the other Investors shall be entitled to purchase all or any portion of the remaining Option Shares by providing notice (the "<u>Supplemental Repurchase Notice</u>" and together with the Company

8

individual during any calendar year exceeds $100,000, such options shall be treated as options which are not Incentive Stock Options.

7. <u>Listing, Registration and Compliance with Laws and Regulations</u>. Each Option shall be subject to the requirement that if at any time the Committee shall determine, in its discretion, that the listing, registration or qualification of the shares subject to the Option upon any securities exchange or under any federal, state or foreign securities or other law, regulation, or the consent or approval of any governmental regulatory body, is necessary as a condition to or in connection with the granting of such Option or the issue or purchase of shares thereunder, no such Option may be exercised or paid in shares of Common Stock in whole or in part unless such listing, registration, qualification, consent or approval (a "<u>Required Listing</u>") shall have been effected or obtained, and the holder of each such Option will supply the Company with such certificates, representations and information as the Company shall request which are reasonably necessary in order for the Company to obtain such Required Listing, and shall otherwise cooperate with the Company in obtaining such Required Listing. If any such restrictions prohibit an Option to be exercised or paid in shares of Common Stock, a Participant's rights to exercise any such Option shall be preserved and any time periods governing such rights or obligations shall be tolled for the duration of such restriction; <u>provided</u> that, unless permitted by Section 409A of the Code, in no event may a Participant exercise an Option beyond the original expiration date of such Option.

8. <u>Adjustment for Change in Common Stock</u>.  In the event of a reorganization, recapitalization, stock split, extraordinary dividend, stock dividend, combination of shares, merger, consolidation or other change in Common Stock, the Committee shall make appropriate changes in the number and type of shares authorized by this Plan, the number and type of shares covered by outstanding Options and the prices specified therein.

9. <u>Taxes</u>.  The Company shall be entitled, if necessary or desirable, to withhold (or secure payment from the Participant in lieu of withholding) the amount of any withholding or other tax due with respect to any amount payable and/or shares issuable under this Plan, and the Company may defer any such payment or issuance unless and until indemnified to its satisfaction.

10. <u>Termination and Amendment</u>.  The Committee at any time may suspend or terminate this Plan and make such additions or amendments as it deems advisable under this Plan, except that it may not, without further approval by the Company's stockholders, (a) increase the maximum number of shares as to which Options may be granted under this Plan, except pursuant to <u>Section 8</u> above or (b) extend the term of this Plan; <u>provided</u> that, subject to the other provisions hereof, the Committee may not change any of the terms of a written agreement with respect to an Option between the Company and the holder of such Option in a manner which would have a significant adverse effect on the holder of such Option without the approval of the holder of such Option.   No Options shall be granted or shares of Common Stock issued hereunder after the tenth anniversary of the Effective Date; <u>provided</u> that, if the term of this Plan is otherwise extended, no Incentive Stock Options shall be granted hereunder after the tenth anniversary of the original Effective Date.

6

"Stockholders Agreement" means that certain Stockholders Agreement, dated as of March 3, 2016, by and among the Company and its stockholders signatory thereto (as amended from time to time).

"Subsidiary" means any corporation or other entity of which the securities or other ownership interests having the voting power to elect a majority of the board of directors or other governing body are, at the time of determination, owned by the Company, directly or through one or more Subsidiaries.

"Termination Date" means the first date on which a Participant is no longer an employee of and not providing services as a director of, or consultant or advisor to, the Company or its Subsidiaries for any reason (or in the case of a Participant who was not an employee, the first date on which such Participant is no longer acting as a director or officer of, or consultant or advisor to, the Company or its Subsidiaries).

3.    Grant of Options.  The Committee shall have the right and power to grant Options to any Participant at any time prior to the termination of this Plan and the Chief Executive Officer of the Company may recommend the grant of Options, specifying which Participants and the number of Options included in such grants, which recommendation shall be subject to approval by the Committee.  Such Options shall be granted at such exercise price, which may be Fair Market Value or such other value determined by the Committee and set forth in a written award agreement with respect to an Option, and on such other terms and subject to such conditions that are consistent with this Plan and established by the Committee.  Options granted under this Plan shall be subject to such terms and conditions and evidenced by agreements as shall be determined from time to time by the Committee.  Any Participant acquiring Common Stock pursuant to an Option shall be required to pay in full the exercise price related thereto, except as otherwise set forth in a written award agreement with respect to an Option. Unless otherwise specified in a written award agreement with respect to an Option, an Option granted under the Plan shall have a term of no more than 10 years.

4.    Administration of the Plan.  The Committee shall have the power and authority to prescribe, amend and rescind rules and procedures governing the administration of this Plan, including, but not limited to the full power and authority (i) to interpret the terms of this Plan, the terms of any Options granted under this Plan and the rules and procedures established by the Committee governing any such Options, (ii) to determine the rights of any person under this Plan or the meaning of requirements imposed by the terms of this Plan or any rule or procedure established by the Committee, (iii) to correct any defect or omission or reconcile any inconsistency in the Plan or in any Option granted hereunder, (iv) to determine whether any Options are subject to and/or comply with the requirements of Code Section 409A or the regulations thereunder and (v) to make all other determinations and take all other actions necessary or advisable for the implementation and administration of the Plan.  Each action of the Committee shall be binding on all persons.  Notwithstanding any provision to the contrary contained in this Plan or any separate written agreement between the Company and any Participant with respect to any Option pursuant to this Plan, any unvested Options that do not become vested immediately prior to, or in connection with, any Sale of the Company shall be forfeited and cancelled with concurrent effect upon the consummation of any such transaction,

4

"Committee" shall mean the committee of the Board which may be designated by the Board to administer the Plan.  The Committee shall be composed of two or more directors as appointed from time to time to serve by the Board.  In the absence of the appointment of any such Committee, any action permitted or required to be taken hereunder shall be deemed to refer to the Board.

"Competitive Activity" means, with respect to a Participant, during the term of such Participant's employment with the Company or any of its Subsidiaries and during the Restricted Period, directly or indirectly, for himself or for any other Person, Participating in any Competitive Business or any business in which the Company is engaged or is planning to engage as of such Participant's Termination Date; provided that the passive ownership by such Participant of not more than one percent (1%) of the outstanding shares of any class of capital stock of a corporation which is publicly traded on a national securities exchange will not be deemed to be a Competitive Activity, so long as such Participant has no active Participation in the business of such corporation.

"Competitive Business" means any business in the geographic area set forth in the non-competition provision in any written employment or severance agreement between the Company or any Subsidiary of the Company and such Participant (or, in the absence of the designation of any such geographic area in any such written agreement, any geographic area or country where the Company or any Subsidiary of the Company generates revenues) engaged in the "Restricted Business" set forth in the non-competition provision in any written employment or severance agreement between the Company or any Subsidiary of the Company and such Participant (or, in the absence of the designation of any such "Restricted Business" in any such written agreement, in the provision of services within the automotive or insurance-related risk or asset management software or information solutions industry related to any product, business, activity or service line of any person, entity or company that is in competition with any product, business, activity or service line of the Company).

"Effective Date" means March 4, 2016.

"Fair Market Value" of an Option Share shall have the meaning ascribed to such term in any Option agreement, written offer letter or employment or severance agreement between the Company or any Subsidiary of the Company and such Participant which expressly applies to the valuation of Options under the Plan, or in the absence of any such written agreement, shall mean the fair market value thereof as determined in good faith by the Committee or, in the absence of the Committee, by the Board.

"Good Reason" shall have the meaning ascribed to such term in any written offer letter or employment or severance agreement between the Company or any Subsidiary of the Company and such Participant, or in the absence of any such written agreement, shall mean Participant resigns from employment with the Company or any Subsidiary of the Company as a result of one or more of the following reasons:  (i) the Company reduces by more than 10% the amount of Participant's base salary or (ii) the Company makes a material adverse change in Participant's duties or responsibilities with the Company or any Subsidiary of the Company, provided that a change in title or a change in the person or office to which Participant reports, shall not, by itself, constitute such a material adverse change.

2